UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| MARK ALLEN PETERSON, | Case No. 3:16-cv-02292-YY |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY,[1] | |
| Defendant. | |

YOU, Magistrate Judge:

Plaintiff, Mark Peterson ("Peterson"), seeks judicial review of the final decision by the

Commissioner of Social Security ("Commissioner") denying his application for Title II Disability

Insurance Benefits ("DIB") and Title XVI Social Security Income ("SSI") under the Social

---

[1] The official title of the head of the Social Security Administration is the "Commissioner of Social Security." 42 U.S.C. § 902(a)(1). Nancy A. Berryhill is currently the Acting Commissioner of Social Security. However, a "public officer who sues or is sued in an official capacity may be designated by official title rather than by name." FRCP 17(d).

Page 1 - OPINION AND ORDER

Security Act ("Act"). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). ECF #4. For the reasons set forth below, the Commissioner's decision is REVERSED and this case is REMANDED for further proceedings.

## BACKGROUND

Born in February, 1962, Peterson was 47 years old on the alleged onset date. Tr. 105, 282.[2] Peterson graduated high school and has not completed any post-secondary coursework. Tr. 369. He has past work experience as a truck driver, cannery worker, and fish filleter. Tr. 23.

## PROCEDURAL HISTORY

Peterson initially filed applications for SSI and DIB on October 25, 2010. Tr. 87. He alleged disability beginning July 3, 2009. *Id.* His applications were denied initially and upon reconsideration. *Id.* On May 16, 2012, a hearing was held before an Administrative Law Judge ("ALJ"), wherein Peterson was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 31-50. On May 22, 2012, the ALJ issued a decision finding Peterson not disabled within the meaning of the Act. Tr. 87-100. Peterson did not appeal this decision.

On August 1, 2012, Peterson filed new applications for SSI and DIB. Tr. 259, 265. Peterson again alleged disability beginning July 3, 2009, due to scoliosis, angina, anxiety, and depression. Tr. 105. His applications were denied initially and on reconsideration. Tr. 13, 181-88, 190-94. On March 5, 2015, a second hearing was held, and on March 27, 2015, a second ALJ issued a decision finding Peterson not disabled. Tr. 13-25, 53-83. After the Appeals Council denied his request for review, Peterson filed a complaint in this court. Tr. 1-6. The

---

[2] Citations are to the pages of the official transcript filed June 1, 2017 (ECF #15).

Page 2 - OPINION AND ORDER

ALJ's March 27, 2015 decision is therefore the Commissioner's final decision subject to review by this court. 20 C.F.R. § 422.210.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). The reviewing court may not substitute its judgment for that of the Commissioner when the evidence can reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted); *see also Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. This sequential analysis is set forth in the Social Security regulations, 20 C.F.R. §§ 404.1520, 416.920, in Ninth Circuit case law, *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing

*Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)), and in the ALJ's decision in this case, Tr. 14-15.

At step one, the ALJ found that Peterson had not engaged in substantial gainful activity after the alleged onset date. Tr. 16.

At step two, the ALJ found that Peterson has the following severe impairments: coronary artery disease, scoliosis, mild degenerative disc disease, and anxiety disorder. *Id*.

At step three, the ALJ found Peterson did not have an impairment or combination of impairments that met or medically equaled a listed impairment. *Id.* The ALJ next assessed Peterson's residual functional capacity ("RFC") and determined that he could perform light work with the following exceptions: he is limited to four hours standing and walking in an eight-hour workday; he can occasionally climb ladders, ropes, scaffolds, ramps, and stairs; he can occasionally stoop, kneel, crouch, and crawl; he should avoid concentrated exposure to vibrations and hazards; he is limited to occasional superficial contact with the public and coworkers; and he is limited to simple, routine, and repetitive tasks consistent with unskilled work. Tr. 18.

At step four, the ALJ found Peterson could not perform any of his past relevant work. Tr. 23. At step five, the ALJ determined Peterson could perform jobs that exist in significant numbers in the national economy, including small parts assembler and production assembler. Tr. 24.

## DISCUSSION

Peterson argues that the ALJ erred by: (1) improperly discounting his subjective symptom testimony; (2) improperly rejecting the medical opinion of the consultative examining psychologist, Daniel Scharf, Ph.D. ("Dr. Scharf"); and (3) erroneously concluding that he was

Page 4 - OPINION AND ORDER

capable of light work rather than sedentary work.

I.      **Preclusive Effect of Prior Administrative Decision**

As a preliminary matter, this court addresses the issue of res judicata. Peterson applied for disability in 2010, and after an administrative hearing, the ALJ found he was not disabled for the period of July 3, 2009, through May 22, 2012. Tr. 87-100. Peterson did not appeal the previous ALJ decision, and it became administratively final. Tr. 13. In the current case, Peterson again alleges disability beginning July 3, 2009. Tr. 105. The principles of res judicata apply to administrative decisions. *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988). Although procedural mechanisms exist for reopening final ALJ decisions, Peterson has not argued that the 2012 decision should be reopened. 20 C.F.R. §§ 404.988, 416.1488. Accordingly, the 2012 decision stands.

Furthermore, the previous ALJ decision creates a presumption of continuing non-disability and in order to overcome that presumption, the claimant "must prove 'changed circumstances' indicating a greater disability." *Chavez*, 844 F.2d at 693 (citing *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985)). Here, the ALJ found that Peterson's impairments have increased in severity since that time. Defendant's Brief, ECF #21, 2 (citing Tr. 13). Therefore, the court evaluates whether Peterson was disabled beginning May 23, 2012.

II.     **Subjective Symptom Testimony**

Peterson alleges that the ALJ wrongfully discounted his subjective symptom testimony. When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v.*

*Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

### A. Activities of Daily Living

An ALJ may consider a claimant's activities of daily living ("ADLs") in assessing whether those activities contradict his testimony about symptoms or functional limitations, or in assessing whether those activities represent functional capacities that are transferable to the workplace. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Here, the ALJ discounted Peterson's testimony for both reasons.

At the hearing, Peterson testified that he had back pain but his insurance did not cover back problems, so he had not sought treatment for years. Tr. 58. He explained that he was taking Naproxen for his back pain but it only helped "a little bit." Tr. 59. Peterson reported that his daughter does a lot of the chores around his house, including vacuuming, cleaning the bathroom, doing the laundry, and washing the dishes. Tr. 64.

Peterson testified that he struggles with anxiety, which makes it hard for him to stay focused. Tr. 60. He stated that his anxiety was not controlled well with medication. Tr. 62. Peterson explained that when he goes out in public, he becomes a "nervous wreck." Tr. 66. He acknowledged that he had never sought mental health treatment from a therapist or counselor,

and said it was because mental health was not covered by his insurance. Tr. 61. Peterson reported that he feels anxiety when he is around strangers, but also when he is around his family. Tr. 60. He explained that generally he only goes outside to walk his dog. Tr. 61.

The ALJ found that Peterson's allegations of disability were contradicted by his activities, which include living alone, reading newspapers, working on plastic model planes for a couple of hours per day, walking his dog, visiting with his father and sister a couple of times per month, getting along with family members, and attending to personal care. Tr. 21. The minimal activities cited by the ALJ do not appear to be inconsistent with Peterson's testimony, and the ALJ failed to explain how those activities contradicted Peterson's testimony. Moreover, the mere fact that a claimant can carry out minimal activities, or attempts to lead a normal life, does not mean that the claimant is foreclosed from disability benefits. *Orn*, 495 F.3d at 639; *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (The "claimant need not vegetate in a dark room to be eligible for benefits.") (citation omitted). As such, the ALJ's general conclusions do not meet the rigorous specific, clear and convincing standard. *Dodrill*, 12 F.3d at 918 (A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible.")

The ALJ also found that Peterson's testimony that he did not go out except to walk his dog, was contradicted by evidence that his father takes him out for lunch once a month, he shops with his daughter, and he "goes out daily." Tr. 21. The ALJ mischaracterized Peterson's testimony. Peterson never claimed that he does not go out except to walk his dog; rather, he testified that aside from walking his dog, he goes out once or twice per week to visit his dad or his sister. Tr. 65. Additionally, he testified that he walks his dog once or twice a day if he can,

and only "maybe a couple of blocks or so." Tr. 64. That is consistent with his statement in his Function Report that he went outside "daily." Tr. 305. Accordingly, Peterson's activities do not clearly contradict his statements.

The ALJ additionally found that Peterson's ability to vacuum and load the dishwasher every other day, do laundry weekly, prepare basic meals, manage his finances, and drive are "indicative of good daily activities and an ability to perform light unskilled work." Tr. 21. "[D]aily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). However, even if vacuuming, loading the dishwasher, preparing basic meals, and driving could be considered "transferable to a work setting," there is nothing in the record to indicate that Peterson spends a "substantial part of his day engaged" in those activities. Indeed, the record indicates the opposite, considering that the cleaning activities are not performed on a daily basis, he "rarely" drives, and his daughter often cooks and does housework for him. Tr. 21, 37, 69, 304, 371. Therefore, Peterson's activities are not a clear and convincing reason to discount his subjective symptom testimony.

### B. Conservative Treatment

The ALJ additionally discredited Peterson's symptom allegations based on a theory of conservative treatment. An "individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *7 (July 2, 1996).

The ALJ found that although Dr. Scharf advised Peterson to seek mental health

Page 8 - OPINION AND ORDER

treatment, there was no evidence that Peterson had received any such treatment in the preceding three years. Tr. 20-21. Peterson contends that his "mental health treatment was limited by his lack of funds and lack of insurance." Pl. Opening Br. 13, ECF #16. Peterson further argues that his doctor never identified any low-cost or free treatment options. *Id.* Analogizing this case to *Trevizo*, Peterson asserts that there is "nothing in the record to contradict [his] claim that he could not afford treatment." *Id.*; *see Trevizo v. Berryhill*, 871 F.3d 664, 680-81 (9th Cir. 2017) (claimant sought treatment but alleged that she could not afford the "expensive pharmaceuticals").

However, as the ALJ noted, "[t]he record does not even indicate that [Peterson] attempted to receive treatment at the emergency room or free walk-in clinic." Tr. 21. Indeed, at the hearing Peterson testified that he had never talked to his doctor about getting counseling.[3] Tr. 61. Moreover, as the ALJ noted, the medical record does not indicate that Peterson was ever denied treatment or medication for either his mental health or any other impairments due to insufficient funds or lack of insurance. Tr. 21. Nor is there any evidence that Peterson "ever sought the support of any and all possibly available private and public institutions, program, or individual to help defray the cost of treatment" or "discussed alternative method of payments with his treating physicians." *Id.*

The ALJ further found that although Peterson reported to Dr. Louise McHarris on February 19, 2014, that he was having anxiety and panic attacks as frequently as twice per day

---

[3] Peterson even contradicted himself during his testimony. He first testified that he had not yet spoken with his doctor about it, but then when the ALJ asked him why he had never asked his doctor about counseling, Peterson backtracked and claimed that he had brought it up with his doctor. Tr. 61 (Peterson: "No. I haven't talked to the doctor about it yet." ALJ: "And why not? Why haven't you brought it up?" Peterson: "Huh? I brought it up but then again, the mental health, it's not covered for my insurance.")

Page 9 - OPINION AND ORDER

(Tr. 422), he did not report any anxiety or related symptoms to his primary care provider since then. Tr. 21. Peterson argues that he did not report anxiety or panic attacks after February 19, 2014, because that was his final appointment with Dr. McHarris. However, the record reveals that following the February 19, 2014 visit, Peterson had at least four subsequent appointments with Dr. McHarris, and he did not report anxiety symptoms on any of those occasions. Tr. 399-402, 411-19. Moreover, Peterson did not seek treatment for his anxiety at any of his medical appointments with Dr. McHarris throughout 2012 and 2013. Tr. 355, 357, 381, 427, 430, 435, 442.

The ALJ additionally found that Peterson's "very limited treatment" for his back pain suggested it was not a significant impairment. Tr. 20. The ALJ noted that Peterson did not have "an MRI, CT-scan or EMG testing, which would be indicative severe limitations." *Id.* The ALJ also relied on the fact that Peterson has not had physical therapy, epidural injections, surgery, or chiropractic treatment. Tr. 20. The ALJ noted that "[m]ost importantly, [Peterson] does not even take narcotic pain medications." *Id.* In fact, a review of the record reveals that Peterson was never prescribed any narcotic pain medications during the relevant period. Furthermore, medical records document only two instances of Peterson seeking treatment for his back pain. Tr. 422, 435.

At the hearing, Peterson initially claimed that he did not seek treatment for his back pain because he did not have insurance. Tr. 58. Peterson subsequently conceded that although he did have insurance, it did not "cover backs." *Id.* Nothing in the record, however, supports Peterson's assertion that his insurance did not cover treatment for back pain. Indeed, on one of the few occasions that Peterson reported back pain to his doctor, spinal imaging was ordered which revealed only mild abnormalities. Tr. 420.

For these reasons, the conservative treatment that Peterson received for his anxiety and back pain is a clear and convincing reason to discount his subjective symptom testimony. Although the ALJ erred in finding that Peterson's activities of daily living were a clear and convincing reason for rejecting his symptom testimony, this error is harmless because the conservative treatment that Peterson received constitutes a valid, clear and convincing reason. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (the ALJ's overall credibility decision may be upheld even if not all of the ALJ's reasons for rejecting the claimant's testimony are upheld).

### III. Medical Opinion Evidence

Peterson argues that the ALJ improperly rejected the medical opinion of Dr. Scharf, the consultative examining psychologist.

#### A. Relevant Law

The Commissioner "must consider all medical opinion evidence." *Tommasetti*, 533 F.3d at 1040 (citation omitted). In doing so, the Commissioner "is responsible for resolving conflicts in the medical record." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008) (citation omitted). Those medical providers "with the most significant clinical relationship with the claimant are generally entitled to more weight than those . . . with lesser relationships." *Id.* (citations omitted). The Ninth Circuit distinguishes between the opinions of three types of physicians: treating physicians, examining physicians, and non-examining physicians. *Garrison*, 759 F.3d at 1012 (citation omitted).

The Commissioner "may only reject a treating or examining physician's uncontradicted medical opinion based on 'clear and convincing reasons.'" *Carmickle*, 533 F.3d at 1164 (quoting *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)). Where such an opinion is

contradicted, it may only be rejected if the Commissioner provides "specific and legitimate reasons that are supported by substantial evidence." *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"Substantial evidence means more than a mere scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Trevizo*, 871 F.3d at 674 (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). In the context of medical evidence, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Revels*, 874 F.3d at 655 (quoting *Lester*, 81 F.3d at 831) (emphasis omitted).

Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's properly discredited subjective complaints, inconsistency with medical records or the claimant's testimony or activities of daily living, or internal inconsistencies. *Tommasetti*, 533 F.3d at 1041; *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-03 (9th Cir. 1999); *Andrews v. Shalala*, 53 F.3d 1035, 1042-43 (9th Cir. 1995). An ALJ must identify the relative weight a medical opinion is accorded in a written decision, and if an ALJ chooses to reject "significant probative evidence," the ALJ must provide legally sufficient rationales. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995) (quoting *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984)).

### B. Dr. Scharf's Evaluation

On March 11, 2013, Dr. Scharf performed a psychiatric evaluation of Peterson. Tr. 369-72. During the examination, Dr. Scharf observed that Peterson's affect was moderately agitated and his mood was moderately anxious. Tr. 371. Peterson lost his train of thought at times, and

he had difficulty following the conversation. Tr. 369. Dr. Scharf noted that Peterson's attention and concentration were moderately disrupted. *Id.* For example, when Peterson was given basic instructions for a three-step task, he incorrectly performed the first step. *Id.* Peterson reported persistent anxiety and explained that he had trouble sitting still, which Dr. Scharf noted was consistent with his own observations during the examination. *Id.* Ultimately, Dr. Scharf opined that Peterson would likely have difficulties with "persistence in his attention after 15 to 20 minutes." Tr. 371.

C. **Clear and Convincing Standard Applies**

As a preliminary matter, Peterson argues that Dr. Scharf's opinion is uncontroverted and, therefore, in order to reject it, the ALJ was required to provide clear and convincing reasons. *Carmickle*, 533 F.3d at 1164. While the ALJ never made a finding that Dr. Scharf's opinion was contradicted by another doctor's opinion, the Commissioner argues that Dr. Scharf's opinion was, in fact, contradicted by non-examining physicians Dr. Boyd and Dr. Nicoloff. The Commissioner points to two purported contradictions.

The first alleged contradiction is that Dr. Scharf observed Peterson "had difficulty understanding and remembering basic instructions today," while Dr. Boyd and Dr. Nicoloff concluded Peterson was "capable of remembering simple and short instructions." Tr. 117-18, 158-59, 371. The fact that Peterson was *capable* of remembering simple and short instructions does not mean that he was *incapable* of struggling with basic instructions on the date of Dr. Scharf's examination. Accordingly, this is not a contradiction.

The second purported contradiction is that Dr. Scharf opined Peterson was suffering from anxiety and alcohol dependence, whereas both Dr. Boyd and Dr. Nicoloff determined

Peterson was suffering from anxiety but not alcohol dependence.[4] Although this does present a contradiction, it is with regard to an issue that is not disputed by the parties. The ALJ found that Peterson's alcohol use was nonsevere and was not "material to the outcome of this case." Tr. 16. Peterson does not dispute this finding. Therefore, to the extent that Dr. Scharf was contradicted regarding Peterson's alcohol use, it was not on a material issue. Because Dr. Scharf was uncontradicted as to the relevant findings at issue in this case, the ALJ was required to provide clear and convincing reasons to reject Dr. Scharf's opinion.

### D. Analysis

The ALJ assigned only "partial weight" to Dr. Scharf's opinion that Peterson was unable to persist for more than 20 minutes on the basis that it was not supported by the record. The ALJ found that (1) Dr. Scharf's clinical findings do not support such severe limitations, (2) Dr. Scharf's opinion was based off of a snapshot evaluation, and (3) the limitation was not supported by subsequent clinical findings or treatment notes from Peterson's treating providers. Tr. 22.

Contrary to the ALJ's assertion, Dr. Scharf's opinion is supported by his clinical findings. Tr. 371. Dr. Scharf observed that Peterson had difficulty sitting still, he appeared anxious during the exam, his anxiety distracted him to the point of losing his train of thought, and he had trouble following the conversation. Tr. 369-70. Additionally, Peterson's "[a]ttention and concentration were moderately disrupted on [the] mental status examination task." Tr. 371. For example, Peterson could not remember the first step of a basic three-step task. Therefore, the purported lack of support in Dr. Scharf's clinical findings is not a clear and

---

[4] While Dr. Boyd and Dr. Nicoloff concluded that Peterson's substance addiction disorder was not severe, they nonetheless determined that it was a "medically determinable impairment." Tr. 114, 155.

Page 14 - OPINION AND ORDER

convincing reason to reject Dr. Scharf's opinion.

The ALJ's conclusory assertion that Dr. Scharf's opinion was just a "snapshot evaluation" also fails. Every opinion provided by an examining physician is by its very nature a snapshot evaluation, in so far as it constitutes an opinion derived from a single examination. Moreover, the opinion of an examining physician is generally accorded greater weight than that of a non-examining physician, and may only be rejected by clear and convincing reasons if uncontroverted, and with specific, legitimate reasons supported by substantial evidence if controverted. *Lester*, 81 F.3d at 830. The rationale put forth by the Commissioner would allow an ALJ to reject an examining physician's opinion merely on the basis that it is an examining opinion, completely obliterating the established precedent in the Ninth Circuit. *See, e.g.*, *Carmickle*, 533 F.3d at 1164; *Lester*, 81 F.3d at 830.

Dr. Scharf's opinion was also more than just a snapshot evaluation; in addition to the diagnostic review and mental status examination that he performed, Dr. Scharf reviewed Peterson's longitudinal medical records. Tr. 369. Notably, the ALJ assigned significant weight to the opinion of non-examining psychologist Dr. Boyd, which was exclusively based on a review of Peterson's medical records. The records reviewed by Dr. Scharf and Dr. Boyd relate to the same time period; Dr. Boyd provided his opinion on March 18, 2013, just one week after Dr. Scharf provided his opinion. Tr. 22, 114, 369. The ALJ's "snapshot evaluation" rationale, therefore, was not a proper reason for rejecting Dr. Boyd's opinion.

The ALJ's assertion that Dr. Scharf's psychological opinion is unsupported by "subsequent clinical findings or physician observations by treatment providers" is also unpersuasive. Tr. 22. As the Commissioner concedes, opinions of medical doctors addressing a claimant's physical impairments are of "limited relevance" to the claimant's psychological

Page 15 - OPINION AND ORDER

impairments. Defendant's Brief 7, ECF # 21. Furthermore, Dr. Scharf's opinion is consistent with the opinions of non-examining psychologists Dr. Boyd and Dr. Nicoloff, who both opined that Peterson would need breaks throughout the day in order to maintain attention and concentration. Tr. 118, 135, 159. Therefore, the lack of support in subsequent treatment notes is not a clear and convincing reason for rejecting the opinion of the examining psychologist, Dr. Scharf.

Additionally, the Commissioner argues that Dr. Scharf's clinical findings did not support his conclusions because his "mental status examination showed adequate grooming, slightly slurred speech, normal orientation, logical and goal-directed speech, moderately agitated affect, moderately anxious mood, good calculation skills, intact remote memory, and moderately impaired concentration," and the ALJ determined that such findings were "benign." Defendant's Brief 9-10, ECF #21 (citing Tr. 20, 370-371). This argument is *post hoc*,[5] and a reviewing court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (internal citations omitted). Furthermore, the findings cited by the Commissioner do not contradict Dr. Scharf's opinion. Based on his evaluation, Dr. Scharf diagnosed Peterson with anxiety and concluded that he would have difficulties with attention. Those conclusions are not contradicted by Peterson's adequate grooming, slurred but logical speech, normal orientation, intact memory, or good calculation skills. Moreover, Dr. Scharf's conclusions are *supported* by his clinical findings that Peterson's mood was anxious, his affect was agitated, and his concentration was impaired. Therefore, the Commissioner's argument is unavailing.

---

[5] Although the ALJ did mention these findings, he did not discuss them in support of his determination that Dr. Scharf's opinion should be given "partial weight." Tr. 20, 22.

Page 16 - OPINION AND ORDER

The Commissioner argues that, by limiting Peterson to "low stress work with superficial interaction with the general public," the ALJ accounted for the impairments identified by Dr. Scharf, and this render harmless any errors the ALJ made in rejecting Dr. Scharf's opinion.[6] Tr. 22. However, the ALJ's functional limitation is predicated on the assumption that Peterson's difficulties with attention and concentration are caused by high-stress situations. The ALJ failed to articulate any basis for that assumption, and the record does not reflect that Peterson's inability to maintain attention and concentration is caused by high-stress environments. Indeed, a review of the record indicates that Peterson's stress is induced by any number of mundane tasks and activities, such as leaving the house, standing in line at the store, or filling out paperwork. Tr. 60, 74, 325, 370, 422. The ALJ ignores that Dr. Scharf's 15-20 minute limitation on concentration and attention is not contingent in any way on high-stress environments. Furthermore, the opinions of Dr. Boyd and Dr. Nicoloff, which the ALJ accepted, both conclude that Peterson would need breaks throughout the day in order to maintain concentration and attention, without reference to the effects of stress. Tr. 22, 135, 159.

Had the ALJ included Dr. Scharf's 15-20 minute limitation on concentration and attention in the RFC, it would have impacted the VE's testimony as well as the ALJ's step four and five findings. *See Stout*, 454 F.3d at 1056 (A reviewing court cannot consider an error harmless "unless it can confidently conclude that no reasonable ALJ" could have reached a different conclusion.) Accordingly, the ALJ's errors in rejecting Dr. Scharf's opinion are not harmless.

///

---

[6] In her harmless error argument, the Commissioner also notes that Dr. Scharf had indicated Peterson's alcoholism could be impacting his anxiety; however, as previously discussed the ALJ found that Peterson's alcoholism was immaterial to the outcome of this case. Tr. 16.

Page 17 - OPINION AND ORDER

**IV. Grid Rules**

Peterson argues the ALJ erred in finding that he was capable of light work rather than sedentary work. Peterson further alleges that, because the ALJ found he was able to perform light work at age 50, the ALJ was required to apply the medical vocational grids. Plaintiff's Reply Brief, ECF #26, 7 (citing SSR 82-41; 20 CFR Pt. 404, Subpt. P, App. 2). Peterson relies on 20 CFR Pt. 404, Subpt. P, App. 2, §200.00(g), which provides: "When such individuals [approaching advanced age (age 50-54)] have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains."

However, Peterson erroneously equates "a limited range of light work" to "sedentary work." The fact that the ALJ determined Peterson was capable of less than a full range of light work does not mean that Peterson was limited to sedentary work. *See Thomas*, 278 F.3d at 960. When an ALJ finds that a claimant can perform less than a full range of an exertional level of work, the exertional limitation is considered to fall "between two grid rules." *Thomas*, 278 F.3d at 960. In that case, the "ALJ fulfills his obligation to determine the claimant's occupational base" by consulting a VE. *Id.* Accordingly, contrary to Peterson's contention, the ALJ correctly relied on VE testimony rather than the grid rules.

**V. Remand**

When a court determines the Commissioner erred in some respect in making a decision to deny benefits, the court may affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (quoting 42 U.S.C. § 405(g)). Except in "rare circumstances," the "ordinary remand rule" dictates that the "proper course . . . is to remand to the agency for

additional investigation or explanation." *Id.* (citing *Gonzales v. Thomas*, 547 U.S. 183, 185 (2006); (additional citation omitted).

In determining whether to remand for further proceedings or immediate payment of benefits, the Ninth Circuit employs the "credit-as-true" standard when the following requisites are met: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) the record has been fully developed and further proceedings would serve no useful purpose, and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison*, 759 F.3d at 1020. Even if all of the requisites are met, however, the court may still remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled[.]" *Id.* at 1021.

Here, the first requisite of the *Garrison* test is met because the ALJ erred in rejecting Dr. Scharf's opinion. However, the second requisite is not met, as the record in this case is not fully developed. Even if the improperly discounted opinion of Dr. Scharf is credited as true, the VE did not provide an opinion regarding the limitations Peterson wishes the court to credit. Therefore, the record is not fully developed and it is not clear that Peterson is, in fact, disabled. Remand for further proceedings is the appropriate remedy. *Treichler*, 775 F3d at 1105 ("Where . . . an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency."). Moreover, although not argued by Peterson, the court notes that despite accepting the opinions of non-examining psychologists Dr. Boyd and Dr. Nicoloff, the ALJ ignored several functional limitations in those opinions. Both Dr. Boyd and Dr. Nicoloff opined that Peterson would need breaks throughout the day in order to maintain attention and concentration. Tr. 135, 159. Both doctors additionally concluded that Peterson was limited to brief, superficial interactions with supervisors. Tr. 135, 160.

On remand, the ALJ shall: (1) accept Dr. Scharf's opinion and incorporate his conclusion that Peterson is unable to maintain concentration and attention for more than 20 minutes at a time into the RFC, or provide legally sufficient reasons for rejecting Dr. Scharf's opinion; (2) draft an RFC that includes the functional limitations assessed by Dr. Boyd and Dr. Nicoloff or provide legally sufficient reasons for rejecting those limitations; (3) obtain additional VE testimony regarding what work Peterson can do, if any in light of these limitations; and (4) conduct any additional proceedings as indicated by the results of the foregoing instructions.

## CONCLUSION

For the reasons discussed above, the Commissioner's decision is REVERSED and this case is REMANDED for further proceedings.

DATED May 9, 2018.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge